# Dorita deLemos Down

___ FILED   ___ ENTERED
___ LOGGED  ___ RECEIVED

JAN 2 4 2013

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___ DEPUTY

5802 Augusta Lane
Bethesda, Maryland 20816
Tel: 301.229.1355
Cell: 301.204.1160
e-mail: doritadd@comcast.net

United States District Court
District of Maryland
Charles B. Day,
U.S. Magistrate Judge
6500 Cherrywood Lane
Greenbelt, Maryland 20770

RE:  Roger Vales et al. v Alma Preciado et al.
     Civil Action No. CBD-05-3110

Esteemed Judge Day:

To further respond to your letter dated January 4, 2013, which contains dates for a Pretrial conference on Thursday, January 24, 2013 at 10:00am in Courtroom 2A and the trial itself beginning at 9:00 am on Tuesday, February 12, 2013. I am herewith providing, as per your instructions, the respective proposed findings of fact and conclusions of law, as required to be in your possession by on or before Thursday, January 17, 2013.

Judge Day, as indicated in previous communications, I am a simple 84-year old infirm woman, whose sole monetary benefits are from monthly security checks; am under medical care; and without much knowledge as to the law governing this type of practice. However, I did receive, from Mr. Roger Vales a copy of their "Plaintiff's Exhibit Binder", and have taken its content to heart to address my facts and conclusions. I have no attorney, since the court failed to appoint one in my behalf, and therefore am at the mercy of the court for all challenges, accusations and sentiments, be these truthful or not, as made by the Plaintiff. Other defendants in this case will, no doubt, also throw challenges, accusations and sentiments, some truthful and other not, in my direction. But I am unable to defend myself physically for precisely the reason mentioned. I shall have Dr. Aleesa Keya, my neurologist, send you a copy of her report on her examination and evaluation of my neurological condition as well as her recommendations. Dr. Gaurang Thaker, my medical provider since well before 1983, is out of the country at present, not returning until the end of next week

1

and is therefore, unable to address the issue of my medical condition. Although if need be, he can be asked to do so, upon his return, and at your request.

## "Proposed Findings of Facts and Conclusions"

It is now almost ten years after the fact, and much has transpired during this time frame. I can no longer remember everything, but I shall try to the best of my ability. Reading through the contents of the various exhibits provided by Mr. Vales, of which there are 61 Items, slowly allows me to recall some portions of the events as these occurred.

**NOTE:** The responses to the items presented are in reverse, starting from the rear and moving forward. In other words, I am starting at Item #61 through and to Item #1 at the front of the binder.

---

Item #61 – E-mail from DDD to various individuals: As you will note in this mail, the idea to work with "Milo" was not mine. I did not know the man, did not understand his business. The fact that such a statement was made must have had some relevancy at the time, but I can no longer remember.

Item #60 – e-mail to Mr. Davenport. He was the chosen attorney for Pidegro, LLC, but needed a push to get things done. He was originally responsible for my meeting Mr. Camp and lauded him to the sky as being an honorable person. The reason for this prepared meeting, was that Mr. Camp was anxious to start a low-income housing construction business in the Philippines, whereas I had been involved, since years, in some form of all types of housing construction in the U.S. and overseas. Mr. Davenport felt there could be a comfortable match.

Item #59 - A bank statement showing my check#1525, issued in my name by Mr. Camp, for $12,500 being cashed. Plus other checks of which I am totally unaware. Mr. Camp handled all financial matters of the Company, be it deposits, payments, issuance of checks, audits, accounting practices, end of year financial tabulations, preparing and presenting corporate financial status documents and so forth. It was his job, and he performed said job without consulting me.

Item #58. – At the time, I was under the impression that somehow a solution could and would be found. Since Pidegro LLC was formed, expenses had been incurred on my part and the company owed me in excess of $22,000 for funds expended in business activities from

2

my own pocket. Mr. Camp was agreeable to pay me a portion of those owed expenses. Mr. Camp handled all matters monetary at his office on 8th St. S.E. I was never privy to what he spent or for what, what checks he wrote for the company or to whom or in what amount. I received a check for $12,500. There were never any more funds offered or for me, even though I asked to be compensated for the remainder of the expenses due me. Mr. Camp worked out of his office in 8th Street, S.E., whereas I worked out of my home office in Bethesda, while Ms. Preciado worked out her office in Silver Spring. We used to get together at one of the other offices, Mr. Campo's or Ms. Preciado's. Never were meetings held at my home office. Most discussions and/or meetings were mostly handled by telephone.

Item #57 – Deposition of Ms. Preciado….many questions were asked of her regarding myself, her association with me, her involvement in Pidegro LLC business, both here and in Mexico, her participation in this situation to which she gave birth. During this deposition, she exercised her rights to take the Fifth Amendment even though the Judge, who was called during this process, indicated that the lawyers for Mr. Vales continue with their questions of Ms. Preciado. It was at this meeting taking place at the offices of Mr. Vales attorney, and, when said deposition was ended, and Ms. Preciado and her counsel had departed, Mr. Vales turned towards me, in not so many words, asked me to work with him and his wife, against Ms. Preciado and Mr. Camp. Mr and Mrs. Vales offered me a ride home, since I was not driving, was using a cane and had been brought to the office by my husband, who continued on his way to a meeting. The Vales' took me home. I brought them into the house, thinking they had my best interests at heart. I introduced them to my dog, Mimi, with which Mrs. Vales played while Mr. Vales told me of all the stories he had uncovered regarding Ms. Preciado. "That she is not a woman, but a man; that she has taken her daughter to court, because the daughter was a drug addict and unfit mother; she had taken the son from the daughter to raise herself; and many other malfeasance accounts pertaining to this person, Ms. Preciado.

Being someone who thinks only the best of people, I shared with the Vales about the work I was doing, which is educating and teaching people about the prevention of Stroke and Cardiovascular Disease. He provided me with his e-mail address and home phone number in Florida, on the possibility that I could mail him information pertaining to our various lectures and presentations. He said he wanted to see what he could do in his geographic area of the country to help us carry forth the message of prevention. After a while, Mrs. Vales, who was enchanted with the dog and didn't want to leave, Mr. Vales insisted it was time to go. Over time, we did correspond briefly, he sent me copies of newspaper articles pertaining to this case, persons he had contacted to make sure that Ms. Preciado would be found guilty of fraud, misdemeanor and criminal charges.

He also was known to contact personal friends of mine, people who were never associated with the company or had anything to do with this matter, but who he thought would speak angrily and negatively against me and thereby, he could find sufficient evidence to find me guilty as well.  Except that never happened, the people who knew me, whom he contacted, in turn contacted me to let me know they were not involved and to stop having him bother them.  I understand, Mr. Vales wanted to find how he could find out whom he considered responsible for this fraud and criminality, and would use all sorts of subterfuges devices and communication means to do so.

Item #56 – again indicates the issuance of check #1525 of Pidegro LLC in the amount of $12,500 to me, and issued by Mr. Camp.

Item #55 – List of checking activity for Pidegro, LLC during April, 2005, May, 2005, June, 2005 and July 2005.  Mr.Camp handled all this activity without my knowledge or that of anyone else, since he was the accountant and corporate Treasurer.  However there is a notation for check #1517, issued, 13 April, 2005, payable to "Metropolitan Financial Svcs" in the amount of $19,975.33, with the comment Memo: Dorita Down/Settlement Chg. 4/5/05.  This occurred without my knowledge and I have no idea why my name is being used here, what reference to a settlemet meant.  He never shared that information with me when I learned of this check's existence.

Item #54 – Citibank Statements of checking account for Pidegro LLC, through October 5, 2005, indicating that the bank closed the account.  Again, this matter was handled in its totality by Mr. Camp and I have no notion or knowledge of any of those activities, nor do I understand the bank statements.  Mr. Camp took me once to this bank to obtain my signature on the account, which was never utilized, but it was a bank requirement, and I could not find the bank branch by myself if necessary.  I had never any dealings with this bank.

Item #53 – indicates activity with Pidegro Mexico wire transfers.  The statement *#1 indicates that Dorita Down and William Camp withdrew cash from the account (? which account) . It was Mr. Camp, I did not ever have anything to do with this account, because I did not handle the monetary aspects of the company, at any time, before Ms. Preciado or after. Statement with *#2, indicates that Dorita Down and William Camp wired a total of $77,666.05 to Mexico.  This action was undertaken exclusively by Mr. Camp, since Ms. Down did not or ever handled monetary activities for this or any corporate account, either in the U.S. or in Mexico or wherever.  Very often, Mr. Camp would insist that I sign certain documents for the company, even though often I preferred him doing so without me.  We must remember that at the time, I trusted Mr. Camp. He would hand me a blank piece of paper and make me sign it, what he did with that piece of paper I have no idea, nor was it

ever reported to me, even when asked. Not only was I being coerced in doing certain things for the company, such as signing certain documents, but was told that I would be repaid for all that effort. This turned out to be a total lie, for I never saw any money except the $12,500 in check # 1525 as stated in the bank statement in Item #56.

Item #48 – The "Banamex" bank application was supposed to be signed only by Mr. Camp. However, the bank insisted on two signatures and Mr. Camp insisted I provide that second signature since I was there with him. No other members of the Mexican corporation operation were there at that time. We had been assured that all matters pertaining to the bridge loan would be resolved in a matter of weeks, and had proceeded to do business in Mexico, a business which was started in . Said Mexican business overture had already started well before obtaining the so-called bridge loan. On several occasions in 2004 both Mr. Camp and I went to Mexico to meet with State government officials, as recommended by Ms. Alma Alfaro-Laska. As a result of business activities in Mexico, Pidegro LLC determined it needed funds to continue functioning. It never occurred to anyone there would be a problem to which a solution was difficult to find. Mr.Camp, myself, friends, and eventually Ms. Preciado as well as the other incorporation members of Pidegro LLC started looking for investors who could be interested in forming part of the company.

Item #46 – At that time, Ms. Alma Alfaro-Laska, a personal friend of mine, representing the State of Hidalgo in Washington, DC, had again made hotel reservations for the arrival of the group early in March 2005. Ms. Alfaro-Laska, of Mexican origin, represented the Governor of the State of Hidalgo, whose office was located in the city of Pachuca, State of Hidalgo, Mexico. The Governor had offered assistance in the construction of pre-fabricated low income homes in the State by agreeing to underwrite the contract for the construction. That was the reason the company required the bridge loan. The purpose being,

1) Obtain the contracts for the construction of pre-fabricated low income housing
2) Use funds obtained from a short term bridge loan,
3) Receive payment from the Mexican State government,
4) Repay the bridge loan.

Trips to Mexico were to meet with government officials, bankers, attorneys and other officials to close the business. Please note, Ms. Alma Preciado had included her sister, Nelly, (who resided in Mexico City) in these activities in the hopes the company would hire Ms. Nelly Preciado as the corporate representative in Mexico.

Once Mr. Vales came on the scene, in April-May, 2005 and a civil suit had been filed with Montgomery County Courts, Ms. Alma Alfaro-Laska told me that she was harassed,

threatened, stalked by Mr. Vales, who upon phoning her lied about his identity and his reason for wanting to speak with her. Ms. Alfaro, to this day is a personal friend and often discusses this event.

Item #45 – This Dorita deLemos Down CV was updated in March 2001, to reflect the intent on the part of Ms. deLemos Down to form a corporate structure for Christian K. Birth's business activities. This was a time when Ms.deLemos Down had not even met Mr. Camp or any of the other persons involved in this situation. **Pidegro, Ltd**. had been loosely formed in 1997, between Mr. Christian K. Birth, a German citizen with U.S. residence, conducting a business of home restoration and refurbishing, Danny (no last name) a friend of Mr. Birth and myself. **Pidegro LTD,** once formalized as a registered corporate entity in 2002, was charged with handling different and various private home improvement jobs which both Danny and Chris would contract for. Among these short term jobs were private residential and vacation homes located in Maryland, DC, Virginia and Florida. Together it was felt important to incorporate because income taxes, paid by independent contractors were too high and, through a corporate structure, the tax burden for individuals would be lessened.

Item #44 – Memorandum to corporate members. The behind the scenes objectives of this document were to demonstrate the positive willingness of each of the members to seriously find the ways in which to repay the bridge loan as rapidly as possible. (See Item #46) Because the attorney, Mr. Davenport had failed to produce such a document, I took it upon myself to do so. Also noted, and as demonstrated in other sections of this Exhibit, copies of and bank statements indicate that 3 monthly repayment checks were issued to Mr. Vales, in May, June and July, 2005, by Mr. Camp, the corporate financial member. It also indicates that the total balloon payment for the bridge loan was to be repaid by no later than October 4, 2005, or 6 months from date of bridge loan issuance. This had been agreed to by the Mexican group through its government contract. However, somehow this failed to be acceptable, since legal actions by Mr. Vales started in May 2005. Why did Mr. Vales accept the monthly repayment checks for May, June and July?

Item #41 – Application for opening a Citibank account for Pidegro, **LLC,** on January 8, 2004, before even Ms. Preciado came on the scene. Said application also indicates that (Dorita deLemos Down) DDD had record of being employed as principal of **Pidegro Ltd,** which stands for (PIoneer DEvelopment GROup) formally formed three years earlier, in the State of Delaware as indicated in Item #15 of this Exhibit. Mr. Birth, Danny and I had been working together without the mantle of incorporation since the late 1990's. **Pidegro, LLC,** on the other hand, was a totally different and distinct entity, of which only Dorita deLemos Down, was a member at the time of its incorporation, together with Mr. Camp and the others. Several members of this civil action have been trying to ensure, indicate, understand,

confirm, and certify that there was a relationship between the two entities only to discover there was never such a thing. Mr. Birth had been insulted, harassed and stalked on various occasions by Mr. Vales, but Mr. Birth would not comply to the threats. The third member of **Pidegro Ltd., Danny,** was not reachable since he had been transferred to Hawaii for his regular work schedule.

Item, #40 – Indicates the deposit ticket of a check in the amount of $350,000, into the Pidegro **LLC** account on April 6, 2005. The annotations on the deposit ticket states "VALES/DOWN", under which are written the numbers 67-965. It also indicates a bank receipt of a Transaction in the amount of $350,000 allegedly deposited to checking with a number, on Apr.06,05 @ 01:13PM. I have no idea what this is, when this occurred or where. The check had been issued to Dorita deLemos Down. Never had it been stated or discussed that upon receipt of this bridge loan, the check were to be issued to an individual. The check was to be issued to the corporation, Pidegro, LLC. But somehow, Ms. Preciado deemed it appropriate to have the check issued to Dorita Lemos Down (not even my name). I was not aware of this occurrence until the check was handed to Mr. Camp at his office on 8th St. S.E. I had never been consulted, I had no idea this was about to happen, I was under the impression the check would be handled differently without my name appearing.

Item #39 – indicates Check # 117, issued to Dorita Lemos Down in the amount of $350,000 as a Bridge Loan, signed by Roger R. Vales and dated April 5, 2005 on Northern Trust Bank of Florida, N.A. The rear of the check has DDD's signature, plus a stamp for Pidegro, LLC plus other illegible stamps. Upon receipt of this check, (see above Item #40) which was a total unknown factor to me. Ms. Preciado had phoned me at home to ask me to come to her office where she had something important to give me. I went to her office in Silver Spring, and she gave me an envelope saying it contained a check for a loan for the company. I did not look at the contents of the envelope, but rather stuck it in my purse and proceeded as fast as possible to the office of Mr. Camp. Arriving at the office, Mr. Camp asked me to sit down at his desk and give him the envelope, since Ms. Preciado had told me she would phone him that I was on my way to his office. He opened the envelope and discovered a check made out to me, Dorita Lemos Down. First and foremost, my name is Dorita deLemos Down, not Dorita Lemos Down. Mr. Camp suggested I endorse the check and he would take care of everything else. I did not want to do that because the check was not supposed to be made out to me, but rather to the company. But Camp wanted to save time and suggested it was not important, that I should go ahead and sign. So I endorsed the check, as Mr. Camp indicated and then turned the whole thing over to him. I never saw him again for several days, as indicated in my daily agenda book.

Items #38,36,35,34,33,32,31, 30,29 ,28, 27,26,25, 24,23, 22, 21, - pertain to documentation, which supposedly I signed on April 5, 2005. Please be aware that on April 5, I had no time to sign any documents because I was given an envelope which allegedly contained a check for $350,000 which had been given to me by Ms. Preciado, plus at the time she was busy with another person and had no time to sit me down to sign papers. Also bear in mind, that on numerous occasions, Ms. Preciado had shown me how she had taught herself to replicate and copy signatures from some of her clients so that she did not need to ask the client to come to her office but to just let her know it was OK for her to sign their name. She showed me, on several occasions how to replicate signatures. My signature is not very easy to replicate, however, she successfully did that and as one can easily see, each of the signatures are identical. In my case, when I sign something, usually there is a great variance to the way I sign a document, especially when there are more than one; there are never two alike. Ms Preciado took great pride in her ability to replicate signatures from other people, in this case, mine included.

Item #20 – is an appraisal of my husband's house, which was done for the company in the event it could be used as collateral for any financial activity. Mr. Down never met Ms. Preciado, except at the Xmas party she gave at her house in Boyds, Md. at Christmas 2004. Mr. Birth, our personal friend and my associate in **Pidegro Ltd**. came along

Item#19 - Bank Statement of accounts for Pidegro, **Ltd**. for the months of December, 2004 – January through November 2005, which had nothing to do with Pidegro **LLC**. This investigative procedure was conducted without Pidegro, **Ltd**. knowledge and the issue of this entity and its activities and the fact that these pertained to activities with Pidegro LLC had been raised again and again by the Plaintiff. Pidegro **Ltd** has never had any involvement with or in the **LLC,** the Plaintiff insisted in checking out this entity, its workings, its people, its bank accounts, which really should have been against the law, since its only relationship to this matter was Dorita deLemos Down, not any of the other members of Pidegro **Ltd.**. To preserve our sanity, the bank account was closed at the end of 2005 and to avoid further unnecessary investigations. It also is to be noted that the Pidegro **Ltd**. account was in a bank other than the one used by Pidegro LLC. The many monetary deposits were payments made by clients to Pidegro Ltd or to Mr. Christian K. Birth, from contracts obtained and sustained by both Mr. Birth and Danny.

Item #15 – The incorporation document of Pidegro, **Ltd**. in Delaware, on May 2, 2002. The question now arises why the two companies carry the same name, only the last portions are different. At this time, I cannot recall why this was done, the only thing I can say is that it probably brought to mind the objective of the establishment of the **LLC,** as noted by the Capability Statement on Item #17. Not that it is in any way similar to the mission of Pidegro,

**Ltd.** This entity Pidegro Ltd. had no Capability Statement, no By-Laws, no Mission statement. It did have a Certificate of incorporation through the State of Delaware, as evidenced by Item#15; it did have a Bank Account as evidenced by Item 19, and was basically a very loosely held entity in which only two persons worked and a third person kept the books from time to time. No other hires were anticipated at any time, because the work objectives were of a private nature, in that the contracts brought into the entity were from private citizens who wanted their residential or vacation homes improved through the addition of a room or deck or garage, a modernization of a bath or kitchen, or the conversion of a basement or a garage into living quarters.

Item #14 – Signatures of Dorita deLemos Down – no two are alike

Items # 5 through 11 represent documents prepared by Ms. Preciado in the hopes of obtaining Mr. Down's residence as collateral for a bridge loan. Mr. Down had not been told of this possibility of using the house as collateral for a loan. It was hoped that should the procedures being utilized proceed in a positive manner, he would accept the involvement. But it was not to be when I finally shared with him what I had done. I am ashamed and have agonized for a long time for having used this subterfuge, with my husband. But he being the good person he is, has totally forgiven me and the matter has never been mentioned again. Mr. Down and I shall celebrate 48 years of marriage on May 1, 2013. Fortunately no damage was incurred, except my husband was taken to court by Mr. Vales, was forced to respond to a series of questions pertaining to his ownership of the property and had to retain legal counsel to represent him, plus his expenses incurred in this process exceeded $22,000. I have never mentioned to anyone that the house is exclusively in the name of Harry W. Down, Jr. and that my name never does appear anywhere on the deed, title or document of ownership. Ms. Preciado insisted that we use the house, because her houses were already collateralizing other loans she had made. That was before she discovered that the house was not in my name. At the time, no one was aware that she had identified someone who could and would provide the needed funds through which Pidegro LLC could continue its objectives, which was to start construction of housing in Mexico, Texas and Maryland. Each of the LLC members specifically went out to identify financial resources wherever these might be found. I, for one, called several acquaintances in the States and overseas, who were in the business of providing loans and finance funding for respective approved project contracts. The Capability statement in Item 17 had been prepared for that specific purpose.

Item #4 – depicts a check issued for rent on a building located in Mineral Wells, Texas. To my knowledge I have no recollection of this matter.

Item #3 – depicts a newspaper article clipping of a newspaper from Mineral Wells regarding Pidegro, LLC's owing of rent on a building. This is the first I see this article, I do not know

who called, I do not recollect having spoken with anyone, even though the article states that I did. I did not handle these type of matters, they were handled by Mr. Camp exclusively.

Item #2 – an unsigned and confidentiality agreement form issued by and between Ms. Preciado, Ms. deLemos Down, and several persons of her acquaintance with regards to a project which had nothing whatsoever to do with **Pidegro, LLC**. The document was prepared in Chicago, Illinois by Mr. Mario Cavallero, business acquaintance of Ms. deLemos , Down.  Mr. Cavallero was unaware that Ms. deLemos Down was not affiliated with Metropolitan Financial Services, nor was he. The objective was to work with Mr. Song U. Kang of KmK, Inc. in Illinois. This project eventually came to nothing and was totally aborted to my knowledge.

Item #1 – Visit to "Lindal" Homes factory in Virginia, in Oct. 2001. The objective was that Mr. Camp had wanted to start a home building business in the Philippines, where he had visited on several occasions.  Mr. Camp's spouse was of Philippine origin.  Mr. Camp had wanted to move to the Philippines and had several friends from that nation within the area, with whom he visited frequently in the hopes of establishing a positive relationship with government officials of that nation. Ms. Down had just recently met Mr. Camp through the efforts of Mr. Davenport, attorney who knew of Ms. Down's activities in the home building and construction arena.  See Item #60 above.

---

Several persons are mentioned within this Exhibit whom I have never met, nor known in any form, not then, not now. What I am surprised is that no documents have been presented in this Exhibit which deal with issues of what Mr. Vales did to make my life and that of my family and friends miserable.  For example there is no evidence that he harassed me by phone, in person and through my friends from 2005, through 2010. I understand he needed to obtain as much evidence as possible to confirm, in his mind, my culpability, but to go about it in a clandestine and subterfuge manner representing himself as someone he is not, using disguises both physically and verbally, harassing with discrediting phone calls and stalking, badgering, pestering persons who knew me but had absolutely nothing to do with Pidegro, LLC. was and is unacceptable.  If the law allows that to happen to decent people then the social laws governing this nation require some form of reform.

I moved into this house in August 1984 with my husband and continue to live at the address, 5802 August Lane, my phone continues to be the same, 301-229-1355. I have willingly and succinctly responded to each and every question, demand, phone call, mailing, deposition requirement, legal mandate and even ultimatums, in spite of my failing health and demand from my doctor to avoid stress in all manner possible.  On some occasions, I have been

unable to respond myself, but rather had someone else write the responses in the form of letters and e-mails.

As for me, I acknowledge wrongdoing on my part.

1. I lied when I placed the house I live in as in my ownership, which is not true. My husband has spent close to $22,000 to clear his name as having any relationship to this criminal action of alleged defraud of Mr. and Mrs. Vales. My husband never met Mr. and Mrs. Vales, has never spoken to them and has no desire to do so. My husband has forgiven me the severe blunder committed and there has never been another mention of this in our daily life. We remain living in the same house, now 28 years plus, and we continue being married now going on 48+ years..

2. I did accept a check in the amount of $12,500 from Mr. Camp for company expenses due me for all the years I had been working with him in a variety of business activities, and had never received another dime. Even though request was made for additional funds to complete the total owed me, I never received anything else. Also all business equipment, such as a laptop, the company had provided me for doing my portion of the business, was returned in full to the offices of Mr. Camp.

3. Ms. Preciado claimed to have many business associates who were in position to offer the needed funding the company hoped to attract, but she never divulged their name as to who these were or her association with them.

4. Ms. Preciado did institute a legal suit against me in the Court of Montgomery County and when I called her attention to it, she said not to worry it was instituted to cover her rear vis-à-vis Mr. Vales.

5. I never knew who Mr & Mrs. Vales were until they arrived at my house one day unannounced; never knew how much funding had been asked of them; since, as a company we had asked originally for $250,000, feeling that amount would be sufficient to give the company the necessary push to meet its commitments. The intention was to obtain a bridge loan for a 6-12 months period which would be repaid with the completion of the contracts in Mexico.

6. Our contacts with the owner of the manufacturing company of the housing panel assembly line was a strong one; his trainee and personal friend, Jimmy Ramirez, was ready to come to work for us in Mexico;

7. We were seriously considering opening a manufacturing plant in Texas and later in Mexico.

8. We did receive real honest to goodness contracts from the Mexican government department during the period 2004/2005, and these contracts were easily valued sufficiently to cover the $350,000 bridge loan from Mr. Vales. The contracts In Mexico were guaranteed by the then Governor of the State of Hidalgo through his office, since it was his office which had provided the original contact.

9. Ms. Preciado insisted that we hire her sister Nelly to be the representative for the company in Mexico, which we did not appreciate nor accept.

10. The people working in Mexico confided in me that they did not appreciate the treatment they were receiving from either Ms. Preciado or her sister and would appreciate we do something about that.

11. During one trip to Mexico, I fell and was rushed to the emergency room at a local hospital. Results were that I had sprained my knee and would be off it for several weeks. I preferred to return home early to be treated by my own medical provider.

12. Nevertheless, the corporate personnel in Mexico was most appreciative and supportive of everything discussed, offered or even suggested by me as it pertained to the Mexico Corporation.

13. Mr. Vales et al have deposed me not once but twice, which I have no idea why. Said depositions were written up, but no copies were sent to me for my records, knowing full well I have not the financial resources to obtain same. Yet, after the deposition of Ms. Preciado, Mr. Vales made overtures to obtain my friendship and trust, by openly sharing the results of his investigation of Ms. Preciado and her family via the Federal government, the FBI and other similar resources. He continued on this vein, hoping to obtain my support against Ms. Preciado and Mr. Camp. He also became interested in the work I was doing through the non-profit entity, called Circle of Rights, Inc., stating he had friends who had suffered strokes and needed help. I did offer to help and sent him several articles, informative and detailed documents as well as recommendations from medical professionals with whom we work. Yet shortly thereafter, Mr. Vales again started to harass me and my friends. This has continued to this date.

14. Surprisingly Mr. Davenport phoned me in early December, 2012, asking for my assistance, claiming he was being harassed by Mr. Vales. I told him I really did not know what he was talking about and let him go.

15. References in the various documents, those that have come to my attention during conversations with the Judge, with the attorneys, about people whom I do not know, I have never met, or even exist. These people claim to know me and yet were we to encounter in the street would probably pass each other by. Some of these people have claimed to know me well, yet, I have never heard of their name, have never met them nor know who they are or what they represent.

16. Since the beginning of 2008, together with another Stroke survivor, Circle of Rights, Inc. a not-for-profit public charitable group was formed, and through it, with very limited funds, mostly volunteering, it offers educational health presentations to prevent the onset of stroke and cardiovascular disease. Recipients include Senior and Community Centers, clinics, hospitals, schools and churches. The presentations, given in Spanish and English by other stroke survivors and myself, include at risk factors such as the prevention and control of Diabetes, High blood pressure, high cholesterol, obesity, poor diet, lack of physical exercise, depression, stress and pain management. The company's web site: www.circleofrights.org depicts these activities through articles, reports, photos, descriptive and informative materials both in English and Spanish.

17. Since 2007, I have been under continuous medical care for circumstances resulting from the severe stroke suffered in November 2003. Another stroke was suffered in August, 2012 from which I am still in a recovery stage.

18. As of last week, I am again in severe depression. A medical appointment with my neurologist has been scheduled for Monday, January 14, 2013, in the hopes that I did not suffer another stroke. According to the last visit with Dr. Keya, she has on several visits with her, cautioned both me and my husband several times for me to be careful, to avoid stress and unpleasant actions, extensive travel, poor eating habits, increase of physical exercise, improved sleeping habits and other positive imaging procedures to produce strength for the stressed and recovering brain. Therefore, I walk twice daily with my dog,. I enjoy water exercises every Monday morning, I avoid all type of stressful situations and stress-producing people. As yet I have not recommenced my lectures and presentations, but hope to do so by the beginning of February 2013.

19. The activity to prepare this document has been extremely stressful and as a result, I have been medicated with Valium and other depression reducing doses. I had hoped that it will meet the requirements as indicated in Judge Day's letter of January 4, 2013

Respectfully Submitted,

Dorita deLemos Down